## Case No. 12,344.

### The SARAH B. HARRIS.

[1 Hask. 52.] [1]

District Court, D. Maine, Dec., 1867. [2]

FORFEITURE—LANDING GOODS WITHOUT PERMIT—VERBAL ASSENT—PERMIT OBTAINED BY FRAUD.

1. A verbal assent from the customs officer to land goods brought from a foreign port is not a compliance with the 50th section of the act of 1799 [1 Stat. 665].

2. Such assent will not save the vessel from forfeiture for landing such goods without a permit.

3. The permit under that act must be in writing.

4. A permit obtained by fraud is no permit, and will not save a forfeiture of the vessel.

In admiralty. Libel in rem by the United States claiming a forfeiture of the schooner Sarah B. Harris, for landing at a domestic port without a permit, goods brought by her from a foreign port. The owners claimed the vessel, and made answer that the goods land-

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]
[2] [Affirmed in Case No. 16,223.]

ed were fish caught in an American vessel by American fishermen and not subject to duty, and that the proper customs officer verbally assented to their being landed.

Geo. F. Talbot, Dist. Atty., for the United States.
Lewis Pierce, for claimants.

FOX, District Judge. This vessel is charged with a violation of the 50th section of the Act of 1799, by landing without a permit at Deer Isle, in Oct., 1866, one hundred barrels of mackerel of the value of ten thousand dollars, brought in said schooner from Port Mulgrave in the province of Nova Scotia.

It is shown that this schooner, Wilson master, being enrolled and licensed for mackerel fishing, with a license to touch and trade at any foreign port during the cruise, sailed from Deer Isle in the month of August on a mackerel trip in Bay of Chaleur. After having taken about 200 bbls., she went into Port Mulgrave and on the 15th of October, there took on board as freight one hundred barrels of mackerel and arrived at Green's landing about the 21st of the same month.

On the 22d of October the captain produced to Vincent J. Warren the deputy-collector for Deer Isle, an "inward foreign manifest," describing the cargo of the schooner as one hundred barrels of mackerel shipped by Chas. R. McDonald, of American fishing schooner Olivia Maria, taken on board at Port Mulgrave, N. S., and consigned to Davis & Co., at Green's landing, Deer Isle. The captain made oath that the manifest contained a just and true account of all the goods on board. There were in fact over 300 barrels on board the schooner, but all but 100 barrels were taken by the crew on the trip.

At the same time the master presented to the deputy-collector a certificate of Chas. R. McDonald under oath, setting forth that he as master of American schooner Olivia Maria had landed 100 barrels of mackerel at Port Mulgrave for transportation to the port of Deer Isle in the United States, and that the same were caught in said American vessel by American fishermen and shipped to the said port of Deer Isle by the schooner Sarah B. Harris of Deer Isle, John Wilson, master. This document was signed and sworn to before the comptroller of customs at Port Mulgrave, Oct. 15th, 1866. Accompanying this certificate was the sworn statement of same date of A. W. Hart and David Wild, who represent themselves as merchants at Port Mulgrave, and who declared on oath that the statements of McDonald in his certificate, are just and true and worthy of full faith and credit. Warren testifies that Capt. Wilson entered his vessel and made entry of the 100 bbls. of mackerel, and that he gave Wilson no written permit, but thinks he gave him a verbal one. That Wilson asked him if it was all right and he told him, "Yes, go ahead and land your mackerel," and therefore they were

unladen. It is quite manifest upon the statement, that the goods in question were brought to the knowledge of this deputy-collector. He was informed that they were a portion of the cargo of the Sarah B. Harris, taken by the crew of the Olivia Maria, transhipped from her in the province of Nova Scotia, and forwarded by the Sarah B. Harris to the United States.

The deputy-collector at Deer Isle believing these mackerel not to be dutiable goods, gave his assent to their being landed, but never granted any written permit for that purpose. The government claims that the permit required by the 50th section of the act of 1799 is a document duly authenticated by the proper officers, and that the verbal assent of the officers to the unloading of the cargo is not sufficient to save the vessel and cargo from forfeiture, and although both the collector and the master, in ignorance of the law, may have supposed a verbal assent was sufficient, yet that cannot alter the law as each party is said to know the law, and the ignorance of the officer of the customs as to the true construction of the law, cannot change the law and make an act legal and valid, which otherwise would be invalid. However harsh such a principle may apparently be, such is and must be the law. Everybody is presumed to know the law, to understand its effects, and must therefore comply with it; and any mistake of any executive officer of the government by which a party is led to violate it, cannot be used as a justification or excuse when he is called upon to answer for its violation. Mr. Justice Story, in U. S. v. Lyman [Case No. 15,647], well remarks, "The collector is but a mere ministerial officer. It may be his misfortune or the misfortune of the public, that he misinterprets the law, but certainly he cannot alter it. The collector had no authority to admit Lovejoy to enter the goods, or give bonds for the duties. The whole proceeding was irregular, and not binding on the United States. * * * The receipt of the bond by the collector was no estoppel to the United States, since no act of his, not within the scope of the law, could vary these rights." When the act therefore prohibits the landing of goods without a permit from the collector and naval officer of any of the ports, what did the law contemplate and intend by these words? Could it have intended thereby, merely the assent of these officers however manifested? Or did it not mean some documentary evidence manifesting their assent? I apprehend an examination of these provisions of the act will leave but little doubt in the mind of any one as to the true meaning of this clause.

The 45th section prohibits the landing of any ship-stores without a permit first obtained from the collector and naval officer; something is to be obtained, not the mere consent of these officers. So too, by the 46th section entry is required of the baggage and tools of a person arriving in the United States, and if he is not the owner of them, a bond is to be given, "and in compliance with the conditions aforesaid and not otherwise a permit shall and may be granted for landing said articles." This certainly indicates something more than a verbal assent to the landing. Something is to be granted by the officers which is here termed a permit. The same language is to be found in the 47th section regulating goods carried to and brought back from a foreign port. It enacts, that after certain formalities shall be complied with, "a permit shall be granted for landing the same." The law having thus in various sections declared "that a permit shall be granted for landing," the 49th section proceeds to declare the form of all permits.

The next section is that, under which a forfeiture is now claimed, which declares the vessel to be liable to forfeiture, if goods, wares, or merchandise of the value of $400 are brought from any foreign port and unladen from her without a permit from the collector and naval officer. Can there be any doubt that the permit so required is one required in the previous section, the form of which is prescribed to be authenticated by the signature of the collector and naval officer? I cannot entertain any doubt on this point, but for satisfactory reasons, I proceed to a further examination of the facts of the case, to ascertain the circumstances under which this verbal assent of the deputy-collector was procured by the master of this schooner.

Wilson represented to the deputy-collector that these mackerel were caught by an American vessel, and produced the certificate of the master of that vessel to substantiate his statement. The deputy-collector relying on this statement, and supposing that in such a case the goods were not subject to duty, admitted them to entry duty free, and gave his assent to their landing in the manner above stated. The government claims that in this a gross fraud was perpetrated, that the mackerel were not thus caught, but that on the contrary they were British mackerel, the property of John Morse a resident at Port Mulgrave; and from a careful examination of the testimony, I am of opinion that such was the fact, that McDonald had no interest in them, but that they belonged to Morse.

Two of the crew of the Sarah B. Harris have been examined; their testimony is, substantially, that on a Sunday morning, they went ashore at Port Mulgrave. One of them was acquainted with Morse, and Morse told him he had 100 bbls. of mackerel which he wanted sent to Green's landing, and wished to know if the Sarah B. Harris would take them. The witness introduced Capt. Wilson to Morse, and Morse informed him what he wanted; the freight to be paid was spoken of. Wilson wanted one dollar per barrel, which Morse thought high, said it was an extra rate, and that if he could not get them in clear of duty, he would rather not send

them. Wilson told him he had no doubt that he could get them in.

No trade was then completed. The next morning, Monday, Oct. 15th, they all met again at Morse's store. Morse and Wilson went out leaving the two witnesses in the store. Soon they returned with Chas. Mc-Donald, master of schooner Olivia Maria, and Wilson then said he would not take Morse's mackerel, but he would take one hundred barrels for Chas. McDonald, at the same rate. The same day the mackerel were taken from the wharf and put on board the Sarah B. Harris by the aid of her boats and crew and of a couple of Englishmen with a boat loaded at Port Mulgrave. One of these witnesses says that McDonald's vessel was at anchor in the harbor one hundred and fifty yards off, but neither he nor his men in any way assisted in putting the mackerel on board the Sarah B. Harris, whilst Morse was present on the wharf help'ng put the mackerel in the boats.

Two more of the crew, Tyler and Smith, speak of the mackerel as being taken from Morse's wharf, and one of them says that they were shipped by Morse, but I think little reliance can be placed on the evidence of this witness on this point as he does not appear to have been present at any of the interviews with Morse.

The ship's-husband of the Olivia Maria testifies that "McDonald returned to Boston in her Nov. 1st, with 190 bbls. of mackerel only, her capacity being over 350 bbls. and that he never received any of the proceeds of the 100 barrels landed from the Sarah B. Harris, and never had any benefit from them. He heard something about one hundred barrels shipped by McDonald, but never could get any direct information about them. That McDonald made three trips that season and sent home by steamer to Boston 280 barrels of mackerel consigned to Clark & Woodward, which he obtained from them through terror of law suit."

What reason McDonald had for so shipping them, and what he intended to accomplish by so doing is not quite apparent, as it is manifest that he could not have expected to conceal from the crew the amount of fish taken on his first trip, after he had shipped them directly to his home port, where he had to return with his crew, all of whom were interested in this cargo on the trip, which had all to be adjusted with the ship's-husband; it would therefore have been an utter impossibility to conceal from the ship's-husband the amount of fish taken, and the same reasoning strikes me with great force in its application to the one hundred barrels in controversy.

If these had been caught by the crew of the Olivia Maria, it must have come to the knowledge of the ship's-husband, and he would have enforced his right, against all parties claiming the property, he owning 7-19 of the vessel. This he does not pretend to have done. If these were taken by the Olivia

Maria, what has become of the crew's share of these 100 barrels? On their return to Boston, which was only nine days after the S. B. Harris arrived at Deer Isle, when they settled with the ship's-husband for their loss, would they not at once have called him to account for this one hundred barrels, more than one third of the whole catch of their trip? Would they not have claimed of him their share and insisted on his looking after them, and finding what had become of them or the proceeds? Every man was interested in this parcel to more than one-third of all his earnings on the trip, and each and all would have proclaimed the fact of the shipment of the one hundred barrels by the S. B. Harris, and their evidence would have been conclusive upon all parties.

For a different reason and one quite conclusive, it seems incredible that McDonald should have shipped these mackerel by the S. B. Harris. He had no occasion for doing it; the mackerel were shipped Oct. 22; his vessel was then at Port Mulgrave repairing as is alleged; he had 190 barrels more; his vessel was bound to Boston; she could carry 350 or 375 bbls. Why, if she had this one hundred to carry, did she not take them herself, instead of paying the extraordinary freight, as is admitted, of one dollar per barrel, when she was bound to her own home port, where her crew were to be discharged and settled with, and where mackerel are usually higher than at Green's landing, and would undoubtedly have brought something more than at this small fishing port. The crew of the Olivia Maria would never have allowed such a freight to be paid, and their property carried where it would not be worth as much as if it was to remain on board and complete the voyage home, nor would the master be so insane as to thus diminish his own share of the profits of the voyage.

There is the testimony of Sullivan Green which corroborates this view quite forcibly. He states that shortly after these mackerel were landed he was in Boston, and one of the present claimants directed him to "tell Charly," one of the consignees of the mackerel at Green's landing, "to make out the freight and the packing bills of the Maria J. Morse mackerel, that John Morse shipped to him by the Sarah B. Harris." It is claimed that Green is the informer and that his testimony on that account should not be credited. If the claimant, who was present in court and heard Green testify to these declarations, desired me to discredit it, he could at least have taken the stand and denied the statement of the witness. Not having so done, I cannot but think it was substantially true; his refusal is an admission that he cannot deny the statement, and if so, it is the express admission of one of the claimants that these mackerel were shipped by John Morse, and of the cargo of the Maria J. Morse as is alleged by the government.

The 71st section of the collection act de-

clares "that in all actions, suits or information to be brought where any seizure shall be made pursuant to this act, if the property be claimed by any person in every such case the onus probandi shall lie upon such claimant;" * * * but "only where probable cause is shown for such prosecution to be judged of by the court, before whom the prosecution is had."

Marshall, C. J., in Locke v. U. S., 7 Cranch [11 U. S.] 348, says: "Probable cause means less than evidence which would justify condemnation; and in all cases of seizure, has a fixed and well known meaning. It imports a seizure made under circumstances which warrant suspicion."

With this burden on the claimants. I will examine the testimony offered by them to remove it. The first is that of Wilson, the master of the schooner; his testimony is in deposition and he in no part of it contradicts the statement of his own crew produced by the government. The excuse is, that the claimants' counsel were not advised that the government had such testimony in evidence and that it is not true, if so, it is extremely unfortunate for the claimants that in the deposition of Wilson as taken, there is not a more sharp and positive denial of Morse having been directly or indirectly concerned in the affair. when from the beginning it seems to have been well understood that the crew claimed that the mackerel were Morse's property. All that Wilson says touching this point is. that he took on board 100 barrels of mackerel shipped by Chas. McDonald, master of a vessel called the Olivia Maria, an American vessel. "Capt. McDonald did all the business with me, expressly himself. He took the mackerel from Sherman's wharf I think. McDonald told me that he landed these mackerel." On cross examination he states: "That he cannot tell how long the mackerel had been landed when he took them. The Olivia Maria was over to Ships' Harbor, Cape Breton, about two miles across from Port Mulgrave on the ways repairing. She had been ashore. I know John Morse; didn't know him to be a shipper of mackerel, but knew him occasionally to ship mackerel; have carried a cargo belonging to him and James Morse, this was subsequent to the present controversy."

I have no doubt that McDonald stated to Wilson all that Wilson says he did, and that the bargain was finally made with McDonald for the transportation of the mackerel, and yet. all that the government witnesses have stated may have taken place as related by them, and in this connection I cannot forget the statement of one of the witnesses "that Morse has gone to the provinces, having told him he was not willing to go to the state prison on account of his connection with this affair." The claimants have also produced certain documents from the custom house at Port Mulgrave, which they claim, should have a controlling influence in the cause and exonerate this vessel from her seizure. These documents consist of the certificate of McDonald before recited, and of an "entry inward" of one hundred barrels of mackerel by the Olivia Maria, Chas. McDonald master, from Gulf of St. Lawrence, by Chas. McDonald, bearing date at Port Mulgrave, Oct. 15, 1866, for transportation from that port to the United States, duty free; on the back of this is the ordinary custom house oath of the importer, McDonald. There is also annexed the landing permit of the one hundred barrels of same date, and a "report outward," of the same date, of Wilson as master of the schooner Sarah B. Harris of the one hundred barrels of sea packed mackerel as shipped by Chas. R. McDonald as per certificate.

All these documents issued from the custom house on the same date, and as no duties were there payable on mackerel, and the customs authorities therefore had no particular reason for a diligent attention to the landing and reshipment, I believe them to have all been fictitious, made for the purpose of covering up the transaction, without in fact the customs officers having any knowledge or information about the property, excepting such as they derived from the parties who were engaged in the conspiracy to defraud the government. The entry in "report outwards" of "Chas. R. McDonald as shipper per certificate," if it has any meaning. so far as I can interpret it, means that McDonald has so certified. and not that the customs officers actually were personally cognizant of the fact.

Moreover. the landing permit bears date Oct. 15th, the entry of the mackerel having been made the same day. I cannot presume that diligent custom house officers allow goods to be landed in her majesty's provinces before entry, or a permit for landing. If so, were the mackerel in question landed on that day from the Olivia Maria? Most certainly not. Wilson, if he is to be credited. says she was then on the ways undergoing repairs at Cape Breton, two miles from Port Mulgrave, and that his crew took the 100 barrels from the wharf at Port Mulgrave. It is very certain therefore. that if Wilson's story is true, these barrels were not landed that day, they were on the wharf, and were not taken from the wharf by some of the crew of Olivia Maria, but by other parties. If they came from the Olivia Maria after the entry and landing permit on that day, they must have been brought by water from Cape Breton. and of course they would have been taken from the boats directly on board the Sarah B. Harris, instead of being carried to the wharf, there landed, and then put into boats and taken off to the S. B. Harris, making a great deal of unnecessary work and handling of the goods, without any possible advantage resulting therefrom. The Olivia Maria. Wilson says was then on the ways repairing. Of course her crew were not me-

chanics or shipwrights, and with a crew of 15 or 20 men unemployed, why did not McDonald set them at work in helping get the barrels on board the S. B. Harris' if they were the property of the crew and owners, instead of employing men and a boat from the shore to do this work.

This entry and permit could not therefore cover and protect the goods in question, as they were previously on the wharf at Port Mulgrave. The documents can not apply to these goods, as the circumstances most manifestly show that they were not there in a situation and condition to need any entry or landing permit.

The clearance of the Sarah B. Harris from Port Mulgrave describes the one hundred barrels of mackerel as sea packed, and of course if they were the cargo of the Olivia Maria they could be none other, as they were secured by her to be carried to the United States, and it is not pretended they were repacked at Port Mulgrave; such must necessarily be the condition of fish transhipped from one vessel to another merely for transfer to the states; parties would have no inducement to have them repacked on shore in a foreign port, when they must subsequently be inspected and repacked after their arrival. Unfortunately for the theory of the claimants, the one hundred barrels which occasion the present controversy were not sea packed fish. The claimants have introduced the evidence of Wm. W. Folsom, originally taken by the government, in which he states "that as deputy-inspector of fish at Deer Isle, he inspected this cargo of the Sarah B. Harris. There were 200 barrels of sea packed mackerel, and she brought home one hundred not sea packed, which were reported to be Charles Mack's." The 200 or thereabouts was just the complement of the catch of the Sarah B. Harris on this trip, and there is no evidence of her having had any of her fare repacked before arriving at Deer Isle: the 100 barrels therefore could not have come from the Olivia Maria, as these were not sea packed according to the evidence, but were repacked, and all the testimony clearly demonstrates that none of the catch of the Olivia Maria had ever been repacked. The landing and clearing and entry having all been on the same day at Port Mulgrave, time would hardly have permitted of their being also repacked at the same time.

These fish, being foreign fish, were subject to a duty of five dollars per barrel on their entry at Deer Isle. By the fraud and misrepresentations of Mr. McDonald and Wilson, the deputy-collector was induced to believe they were taken by the crew of an American vessel and therefore not subject to duty, and without payment of any duty whatever he consented verbally to their being landed. Under such circumstances would a permit, if in legal form, according to the requirements of the statute have been of any validity? The collection act provides that goods subject to duty shall not be landed before the duties are paid or secured in some way, and that the permit required by the 50th section shall issue previously to the payment of the duties, or the receipt of security therefor. The permit in the present case, if it may be so described, was obtained from the government by the gross fraud of the pretended owner of the mackerel and of the master of this schooner; each of them was aware of the fraud and participated in it. If so, of what validity was this or any other permit? Whatever is done in fraud of the law is in violation of it, and the same rules apply to a fraud on the government as when practiced on an individual. Fraud vitiates every transaction. A deed when obtained by fraud is to be considered as a void contract as to the fraudulent party. Fraud will avoid even the most solemn proceedings of courts of justice. The force of a permit, under the 50th section of the collection act, obtained by fraud was well considered by Mr. Justice Story in Bottomley v. U. S. [Case No. 1,688], which was a proceeding under this section of the collection act, in which he decided that a permit obtained by fraud was no permit, and that goods landed under such a permit were liable to forfeiture, and that such forfeiture may be enforced under a general count similar to the present, charging that the goods were landed without a permit, for a void permit is no permit.

No explanatory evidence from the officers of the customs at Port Mulgrave, showing on their part a personal knowledge that this lot of mackerel arrived there on the Olivia Maria, or from Morse or McDonald, or the other owners of this schooner, who were the consignees of this portion of her cargo, is offered by the claimants to remove the more than probable cause of suspicion which exists against this vessel. Much of this explanatory testimony, if it exists, is within the control of the claimants, and might have been produced by them. Their failing to do so cannot but have an unfavorable impression upon the mind of the court. I do therefore order, pronounce and decree, that this schooner, Sarah B. Harris, with her tackle, apparel and furniture is forfeited to the United States.

[On appeal to the circuit court, the decree of this court was affirmed. Case No. 16,223.]

SARAH B. HARRIS, The (UNITED STATES v.). See Case No. 16,223.

SARAH E. BROWN, The (HOVEY v.). See Case No. 6,744.